UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:15-CV-00093-GNS-HBB

EDMUND BICKETT; and
BICKETT BROTHERS FARMS                                              PLAINTIFFS


v.


COUNTRYMARK ENERGY
RESOURCES, LLC                                                       DEFENDANT


## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Plaintiffs' Motion for Partial Summary Judgment (DN 41), Defendant's Motion for Partial Summary Judgment (DN 42), and Defendant's Motion to Strike (DN 46).  For the following reasons, Plaintiffs' Motion for Partial Summary Judgment and Defendant's Motion for Partial Summary Judgment are **GRANTED**, and Defendant's Motion to Strike is **DENIED**.

### I.      SUMMARY OF FACTS AND CLAIMS

#### A.      History of Property and Oil Drilling Operations

This lawsuit centers around a dispute between the surface owner and mineral owner of real property that was formerly part of the Camp Breckenridge military base located in Union County, Kentucky.  (Def.'s Mot. Partial Summ. J. Ex. 2, DN 42-3 [hereinafter 1965 Mineral Deed]; Def.'s Mot. Partial Summ. J. Ex. 5, DN 42-6 [hereinafter 1966 Surface Deed]).  The mineral rights in the property were conveyed by warranty deed in 1965 from the United States to United States Steel and Carnegie Pension Fund.  (1965 Mineral Deed).  The mineral rights passed through various successors in interest and were eventually assigned to Defendant

1

Countrymark Energy Resources, LLC ("Defendant"), in 2010.  (Def.'s Mot. Partial Summ. J. Ex. 13, DN 42-14).  The surface estate was conveyed by warranty deed in 1966 from the United States to Plaintiff Edmund Bickett ("Bickett"), his brother James C. Bickett, and their wives. (1966 Surface Deed).  Language in the deed reserved the following rights for the mineral holders:

> 1.      Rights of the owner or owners of minerals and mineral rights, including the United States of America, to *such use of the surface areas of the property conveyed hereby which is reasonably necessary* to prospect, explore, mine, operate, produce, store and remove minerals, provided, however, that the owner or owners of the mineral rights shall be liable to the owner or owners of the surface area for actual damages caused thereby to the surface, improvements, livestock and growing crops.  This provision shall not be in derogation of any other rights of the owners of minerals and the surface under the laws of the State of Kentucky.  Nothing herein shall constitute or be construed as a waiver of the sovereign immunity and power of the United States of America as the owner of the reserved coal and mining rights in and under the property hereby conveyed.

> 2.      Rights of the owners of minerals and mineral rights, including the United States of America, and surface property owners to the non-exclusive use of existing roads within the confines of Camp Breckinridge Reservation for the purpose of ingress and egress.  Reference herein to the various roads within the confines of Camp Breckinridge Reservation is based on a map heretofore filed for record on March 18, 1966, in the records of the Union County Court Clerk's Office in Deed Book 182, page 1, . . . .   Said map is incorporated herein by reference as if fully copied herein.

> 3.      Any and all existing reservations, easement, etc., recorded or unrecorded, or public highways, roads, railroads, pipelines, drainage, sewer lines, water lines, telephone and telegraph lines, and public utilities, if any.

(1966 Surface Deed 7-8).  Eventually, two tracts were conveyed solely to Bickett and his wife. (Def.'s Mot. Partial Summ. J. Ex. 8, DN 42-9).  Edmund Bickett leases the land for farming purposes to Plaintiff Bickett Brothers Farm ("Bickett Brothers"), a partnership composed of his sons, Tim Bickett and Kim Bickett.  (T. Bickett Dep. 12:24-13:2, Feb. 23, 2016, DN 42-19).

In 1965, the mineral rights were conveyed to Ashland Oil and Refining Company ("Ashland").  (Def.'s Mot. Partial Summ. J. Ex. 3, DN 42-4).  Ashland drilled seventeen wells on

the property in 1966.  (Def.'s Mot. Partial Summ. J. Ex. 9, Attach. A, DN 42-10; Def.'s Mot. Partial Summ. J. Ex. 9, at ¶ 2, DN 42-10 [hereinafter Hancock Aff.]).  Access roads to the wells were created no later than 1968 and have not substantially changed since this time.  (Hancock Aff. ¶ 3; T. Bickett Dep. 38:18-39:10).  Ashland installed electric lines and poles on the property for the purpose of running its oil wells at some time prior to 1991 and also installed gates and access points on the property.  (T. Bickett Dep. 23:3-24:7, 70:10-11; Def.'s Mot. Partial Summ. J. Ex. 19, ¶ 6, DN 42-20 [hereinafter Coker Aff.]).

**B**.     <u>**Prior Litigation**</u>

While in the process of drilling the wells in 1966, Ashland filed a lawsuit in Union Circuit Court alleging that James and Edmund Bickett had been interfering with, harassing and intimidating persons performing the drilling work.  (Def.'s Mot. Partial Summ. J. Ex. 14, DN 42-15).  The Bicketts counterclaimed for $150,000, alleging that Ashland had been using the surface unreasonably, arbitrarily, and capriciously and had unreasonably, and unnecessarily damaged the surface and the improvements of their land.  (Def.'s Mot. Partial Summ. J. Ex. 16, at 3, DN 42-17).

The parties eventually settled the matter and entered into a "Release of all Claims – Settlement in full" ("the Release") in December 1968.  (Def.'s Mot. Partial Summ. J. Ex. 17, DN 42-18 [hereinafter Release]).  The Release provided that "[i]t is understood that this RELEASE covers all damages to the First Parties' Union County property, both temporary and permanent, and includes but is not limited to the space as shown on the attached map and the attached Summary of Damages, and includes those damages mentioned in Paragraph 1, at page 7, of the First Parties Deed. . . ."  (Release 106-107).  For the consideration of $10,500, Edmund and James Bickett released and discharged Ashland, its successors and assigns, of and from:

> (1) all damages incurred to the date of this instrument of whatsoever nature and character, including but not limited to, damages to land, crops, vegetation, timber, natural and man-made drainage ways, fences, roadways and improvements and (2)     all damages for the use and occupation of said surface areas as long as Second Parties shall prospect for, explore for, mine, operate, produce, store and remove the oil, gas, and all other minerals and mineral rights conveyed to them by the United States of America . . . .

(Release 107-08).  The Release further provided that Ashland and its assigns were "permanently released from all claims for damages for the future use and occupation of those portions of the above described real estate referred to in part (2) of the immediately preceding paragraph." (Release 108).  Further, Ashland was "*not* released from such claims for damages that might arise as a consequence of their future operations of the lands owned by first parties, for example, growing crops, livestock, or improvements or *damages outside of the roadways now in use or outside of the areas occupied by the existing oil wells*, second parties shall be liable therefore . . . ."  (Release 108 (emphasis added)).  The summary of damages included as an exhibit to the Release demonstrates that compensation was paid to the Bicketts for 322,993 square feet for the well sites and 123,210 square feet for the access roads.  (Release 125).

## C.   Present Litigation

Ashland transferred the mineral rights to Geigo Company LLP ("Geigo") in 1991. (Def.'s Mot. Partial Summ. J. Ex. 19A, DN 42-21).  In 2005, Geigo drilled an additional well (the "Geigo well"), bringing to eighteen the total number of wells on the property.  (Def.'s Mot. Partial Summ. J. Ex. 9, Attach. A, DN 42-10).  Geigo paid Edmund Bickett $1,840 for permanent damages to the 0.46 acres associated with the drilling of this well.  (Def.'s Mot. Partial Summ. J. Ex. 20, DN 42-22).  The mineral rights were subsequently assigned to Defendant in 2010.  (Def.'s Mot. Partial Summ. J. Ex. 13).  In 2014, Defendant contracted with Bay Geophysical to perform seismic testing on the property, which  resulted in crop damage to

4

corn located on the property.  (Hancock Dep. 14:22-15:2, Apr. 18, 2016, DN 43-10; Hancock Aff. ¶ 7).  Defendant admitted liability for the loss of crops due to seismic testing, but the parties have not come to a resolution as to payment for the crops destroyed.  (Def.'s Resp. Pls.' Mot. Partial Summ. J., DN 43-2 [hereinafter Def.'s Resp.]).

This led Plaintiffs to file this action in Union Circuit Court.  (Compl.)  On July 15, 2015, the action was removed to this Court.  (Notice Removal, DN 1).  Plaintiffs assert a number of claims, seeking compensation for:  (1) damage to crops due to the seismic testing; (2) use of more surface area than is reasonably necessary due to the number of access roads and well sites; (3) use of more surface area than is reasonably necessary due to electric poles and guywires; (4) burial of the electric lines and poles because they are an unreasonably dangerous use of the property; (5) replacement of gates on the property that are unreasonably and negligently maintained; (6) replacement and removal of pipe bridges on the property that are unreasonably and negligently maintained; (7) annual payments to maintain the access roads and well sites by spraying and mowing to maintain the noxious vegetation that negatively affects Plaintiffs' crop yield.  (Compl. ¶¶ 5-13).  Plaintiffs maintain that Defendant's negligence as to the structures complained of unreasonably and unnecessarily interferes with Plaintiffs' right to use the surface estate.  (Compl. ¶ 13).

Plaintiffs have moved for summary judgment as to the claim for crop damage due to seismic testing.  (Pls.' Mot. Partial Summ J., DN 41).  Defendant has moved for summary judgment as to all remaining claims.  (Def.'s Mot. Partial Summ. J., DN 42).  These matters have been fully briefed and are ripe for decision.

## II.      JURISDICTION

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000.00.

## III.      STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law.  *See* Fed. R. Civ. P. 56(a).  The moving party bears the initial burden stating the basis for the motion and identifying evidence in the record that demonstrates an absence of any material factual dispute.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine issue of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson*, 477 U.S. at 252.

# IV.   DISCUSSION

As a threshold matter, the Court will discuss the proper legal relationship between the mineral owner and surface owner of an estate, as there seems to be some confusion as to the rights a mineral owner possesses.  Under well-established Kentucky law, "[a]n oil and gas lease, or owner of minerals, unless expressly limited by the terms of the lease or conveyance, has the right to use and occupy so much of the surface as may be necessary and reasonably convenient in the exercise of his rights in operating his facilities and marketing the oil and gas, even to the preclusion of any other surface possession."  *Lindsey v. Wilson*, 332 S.W.2d 641, 642 (Ky. 1960) (citation omitted); *see also Wiser Oil Co. v. Conley*, 346 S.W.2d 718, 722 (Ky. 1960) ("There is a sound basis for the rule that a deed or lease of minerals carries with it the right to use as much of the surface, or other property, as may be reasonably necessary to exploit the minerals.").

The mineral and surface owner "have correlative rights and duties which neither may unreasonably exercise to the injury of the other."  *Higdon v. Ky. Gas Transmission Corp.*, 448 S.W.2d 655, 657 (Ky. 1969).  Thus, the owner of minerals may become liable to the surface owner if the surface owner suffers injury from the mineral owner's negligence in its use of the land, and vice versa.  *Ill. Basin Oil Ass'n v. Lynn*, 425 S.W.2d 555, 558 (Ky. 1968). "Additionally, [the mineral owner] 'shall not utilize any more of the surface estate than is reasonably necessary for exploration, production and development of the mineral estate.'" *Chesapeake Appalachia, LLC v. Williams*, No. 7:10-87-KKC, 2012 WL 2178859, at *3 (E.D. Ky. June 13, 2012), *aff'd*, No. 12-6517 (6th Cir. Oct. 17, 2013) (quoting KRS 353.595(5)).

The deed conveying the surface rights to Edmund and James Bickett provided that the mineral owner has the right to "use of the surface areas of the property . . . reasonably necessary to prospect, explore, mine, operate, produce, store and remove minerals, provided, however, that

the owner or owners of the mineral rights shall be liable to the owner or owners of the surface area for *actual damages* caused thereby to the surface, improvements, livestock and growing crops." (1966 Surface Deed 7-8 (emphasis added)). The rights granted to the mineral owner in the deed clearly gave the mineral owner a dominant easement. *See Wells v. N. E. Coal Co.*, 118 S.W.2d 555, 556 (Ky. 1938).

Plaintiffs describe the basis for their various claims as Defendant's "unreasonable and unnecessary use" of the surface estate which caused an "ongoing interference with Plaintiffs' rights to use property." (Pls.' Ans. Interrog.). Defendant asserts a variety of defenses to Plaintiffs' claims, including a contractual release of claims, statute of limitations, laches, and failure to state legally cognizable damages. Whether Plaintiffs' various claims survive summary judgment will be explored in turn.

### A.   Access Roads and Well Sites

Plaintiffs allege that the access roads and wells on the property utilize more surface area than is reasonably necessary to conduct its drilling operations. (Compl. ¶ 8). Defendant argues that this claim is barred by the 1968 Release, the applicable statute of limitations, laches, and, in addition, fails on the merits.

"A release is a private agreement amongst parties which gives up or abandons a claimant's right to prosecute a cause of action." *Prater v. EQT Prod. Co.*, No. 2013-CA-000363-MR, 2014 WL 6687567, at *2 (Ky. App. Nov. 26, 2014) (citing *Waddle v. Galen of Ky., Inc.*, 131 S.W.3d 361, 364 (Ky. App. 2004)). The Release from the 1966 lawsuit released all future liability of Ashland, and its successors in interest, for "all damages for the use and occupation of said surface areas as long as Second Parties shall prospect for, explore for, mine, operate, produce, store and remove the oil, gas, and all other minerals and mineral rights

8

conveyed to them by the United States of America . . . ." (Release 107-108).  It further provided that "[s]econd parties are not released from such claims for damages that might arise as a consequence of their future operations of the lands owned by first parties, for example, growing crops, livestock, or improvements *or damages outside of the roadways now in use* or outside of the areas occupied by the existing oil wells, second parties shall be liable therefore . . . ." (Release 108 (emphasis added)).

Plaintiffs concede that there are no damages recoverable for the use of the roads and wells existing at the time of the execution of the Release.  (Pls.' Resp. Def.'s Mot. Partial Summ. J. 16 [hereinafter Pls.' Resp.]).  The access roads and well sites were installed in 1966 and have not materially changed since this time.  (Hancock Aff. ¶ 3; Coker Aff. ¶ 7).  Moreover, Plaintiffs have provided no evidence that any roads have been constructed on the property since the 1960s and Plaintiffs were paid for the only other well drilled since then by Geigo in 2005.  Therefore, Plaintiffs' claims as to the access roads in existence in 1968 are barred by the Release and claims related to the access road to the Geigo well are barred by Geigo's 2005 payment to the surface owners.  (Def.'s Mot. Partial Summ. J. Ex. 20).

Defendant argues that Plaintiffs' claim regarding all of the access roads and well sites, including any covered by the Release, are barred by the applicable statute of limitations. As mentioned above, the roads and well sites were constructed by Ashland prior to the 1966 settlement, except for one well drilled by Geigo in 2005 for which Bickett was paid.  (Def.'s Mot. Partial Summ. J. Ex. 20; Hancock Aff. ¶¶ 2-3).  Further, Tim Bickett began farming the property forty years ago and testified that the roads have been in place since he became familiar with the farm.  (T. Bickett Dep. 38:18-39:10).

Defendant contends that the fifteen-year statute of limitations in KRS 413.090(2) for a claim based on written contracts applies because Plaintiffs' claims are based on the rights in the respective deeds. *See* 26A C.J.S. *Deeds* § 3 (2017) ("A deed is a written contract.  Accordingly a deed is defined as a writing or instrument on paper or parchment sealed and delivered to prove and testify the agreement of the parties . . . .  A deed is the final expression of the agreements between the parties as to every subject which it undertakes to deal with."  (internal footnotes omitted) (footnote omitted)).  If the fifteen-year statute of limitations were applicable, it would bar all of Plaintiffs' claims except those pertaining to access roads related to the Geigo well.  In their response, Plaintiffs specifically disclaim any breach of contract cause of action, arguing "KRS 413.090(2) does not apply to the circumstances now before the Court.  The statute applies in circumstances where there is an issue concerning an action on a bond, judgment or contract.  There is no dispute about the Bicketts owning the surface operation and there is no dispute before the Court as to the ownership of the minerals below the surface."  (Pls.' Resp. 18).  Although the parties' rights arise under their deeds, the present dispute is not tied to the fact of the conveyances, but is directed to Defendant's activities on the land.  Thus, it appears that KRS 413.090(2) does not apply.

Instead, it appears appropriate to characterize Plaintiffs' claims as arising from improvements to the property, for which the five-year statute of limitations for a claim for property damages would apply.  In relevant part, KRS 413.120 provides that there is a five-year statute of limitations for "[a]n action for an injury to the rights of the plaintiff, not arising on contract and not otherwise enumerated."  KRS 413.120(6).  Because the Geigo well was drilled more than five years before the filing of this action, claims related to this last well would be time barred, as well as all other claims for the access roads which have been in place since the 1960s.

*See Harvey Coal Corp. v. Smith*, 268 S.W.2d 634, 634-35 (Ky. 1954) (holding that the counterclaim filed by the landowner against the coal leaseholder for damages was barred by the five-year statute of limitations in KRS 413.120), *overruled on other grounds by Armstrong v. Logsdon*, 469 S.W.2d 342 (Ky. 1971).

Plaintiffs' attempt to avoid application of the five-year statute by characterizing the access roads and wells as a "continuing trespass." (Pls.' Resp. 19-20). Kentucky courts have recognized that "[o]ffending structures causing continuing trespasses and recurring damages are not susceptible to a simplistic application of the five-year limit." *Wimmer v. City of Ft. Thomas*, 733 S.W.2d 759, 760 (Ky. App. 1987). In determining if a structure constitutes a continuing trespass or nuisance, Kentucky courts analyze whether the structure is temporary or permanent. *Id*. at 760 (citing *Madisonville, Hartford & E. R.R. Co. v. Graham*, 144 S.W. 737 (Ky. 1912)). If the structure is permanent, actions must be commenced within five years from the date the "structure was completed and its operations commenced, or the date of the first injury, or the date it became apparent that injury would occur." *Id.* at 761 (citing *Lynn Mining Co. v. Kelly*, 394 S.W.2d 755 (Ky. 1965)). In contrast, if a structure is "temporary, an action may be commenced at any time, with the only limitation being that damages cannot be recovered for so much of the injury *as occurred more than five years before the action was commenced*." H. Brent Brennenstuhl et al., *Kentucky Law of Torts* § 24-2 (2d ed. 2001) (emphasis added) (citing *W. Ky. Coal v. Rudd*, 328 S.W.2d 156, 160 (Ky. 1959)).

Kentucky's highest court held that a structure is permanent "if the structure is one which may not be readily remedied, removed, or abated, at reasonable expense, or is of durable character intended to last indefinitely . . . ." *Fergerson v. Utils. Elkhorn Coal Co*., 313 S.W.2d 395, 400 (Ky. 1958). Here, there is no issue of material fact that the roads and wells were

intended to last indefinitely and are durable in nature, as the structures have been on the property for nearly fifty years.  Moreover, removal of the roads and wells could not be achieved at a reasonable expense.  The record establishes that the roads and wells are clearly permanent structures.  Since most of the structures were completed before 1968 and the last well was drilled in 2005, claims related to these improvements are barred by KRS 413.120(6)

Alternatively, Defendant asserts that Plaintiffs' claims are barred by the doctrine of laches.  "[T]he doctrine of laches will bar a claim where an unreasonable delay in asserting [the claim] resulted in disadvantage or prejudice to the opposing party."  *Joseph v. Joseph*, No. 2008-CA-000942-DG, 2009 WL 1974596, at *3 (Ky. App. July 9, 2009).  As this Court stated in *Madison Capital Co., LLC v. S & S Salvage, LLC*, 765 F. Supp. 2d 923 (W.D. Ky. 2011), in determining when the defense of laches applies:

> [T]here are two elements to be considered.  As to what is unreasonable delay is a question always dependent on the facts in the particular case.  Where the resulting harm or disadvantage is great, a relative brief period of delay may constitute a defense while a similar period under other circumstances may not.  What is the equity of the case is the controlling question.  Courts of chancery will not become active except on the call of conscience, good faith, and reasonable diligence.  The doctrine of laches is, in part, based on the injustice that might or will result from the enforcement of a neglected right.

*Id.* at 936 (quoting *Plaza Condo. Ass'n, Inc. v. Wellington Corp.*, 920 S.W.2d 51, 54 (Ky. 1996)).  With the exception of the 2005 well and access road, the access roads and well sites were installed by Defendant's predecessors in interest before 1970, and Plaintiffs or their predecessors were certainly aware that the access roads and wells were in place on their property.  (Coker Aff. ¶ 7; Hancock Aff. ¶¶ 2-3; T. Bickett Dep. 38:18-39:10).

Defendant avers that it has suffered prejudice because the fifty-year delay and the fact that the mineral ownership has changed hands numerous times will be create difficulties in attempting to obtain witnesses and ascertain facts from the distant past.  (Def.'s Resp. 18-20).

Defendant deposed Edmund Bickett, now late in age, and he could remember little of the events from long ago.  (Def.'s Mot. Partial Summ. J. Ex. 26, DN 42-27).  *See Finnerty v. RadioShack Corp.*, 390 F. App'x 520, 525 (6th Cir. 2010) (holding that the plaintiff's claim as to subsequently added second defendant was barred by the doctrine of laches because the defendant was prejudiced by the difficulty in finding witnesses and documents as well as the inability of the second defendant to seek indemnification from the insolvent defendant).

Plaintiffs argue that Defendant should not be entitled to use the defense of laches because "Defendant does not have clean hands."  (Pls.' Resp. 21).  Of course, laches is an equitable doctrine, and a defendant must have "clean hands" before it is applied.  *See Parker v. Parker*, No. 2012-CA-000079-MR, 2013 WL 2359661, at *2 (Ky. App. May 31, 2013).  However, Plaintiffs have pointed to no evidence or facts that support their contention that Defendant does not have clean hands.  There is absolutely no evidence that Defendant has acted fraudulently, unethically, or in bad faith.  While the roads and wells are still presently located on the property, the structures have been in place for nearly fifty years, yet no legal claims were made between 1968 and the present suit filed in 2014.  "Equity aids the vigilant, not those who have slept on their rights . . . ."  *Barrowman Coal Corp. v. Kentland Coal & Coke Co.*, 196 S.W.2d 428, 433 (Ky. 1946) (internal quotation marks omitted).  Therefore, considering the lapse of time and prejudice caused to Defendant, Plaintiffs' claims as to the access roads and well sites are also barred by the doctrine of laches.

Finally, what is most lacking in Plaintiffs' claim regarding the access roads and well sites is any evidence explaining how the amount of the surface estate utilized by the roads and wells is *unreasonable* in amount.  In this regard, Defendant has provided the opinions of its expert, Jeff Roberts ("Roberts"), establishing that Defendant's use of the roadways and well sites is a

reasonable use of the surface.   (Roberts Report 2).   Roberts observed that the roads were constructed "along ditches and tree lines to minimize field loss" and in "open fields were straight and placed in a manner to minimize surface usage as much as possible."   (Roberts Report 3). Plaintiffs on the other hand, submit absolutely no evidence supporting their contention that the roads and well sites use more land than is reasonably necessary.   *See Chesapeake Appalachia, LLC*, 2012 WL 2178859, at *5 ("[The mineral rights owner's] evidence also demonstrates that they are not using 'any more of the surface estate than is reasonably necessary for exploration, production and development of the mineral estate.'   K.R.S. § 353.595(5). [The surface owner] presents no evidence, expert opinion or otherwise, that contradicts [the mineral rights owner's expert's] opinion that any structure on the well location will interfere with Well No. 825727's operation.").

Plaintiffs attempt to avoid the application of the release, statute of limitation, and the doctrine of laches by arguing that the roads are "ever-expanding" in width.  (Pls.' Resp. 16). In support of this position, Plaintiffs attached the affidavit of Truitt Clements ("Clements"), an employee of Bickett Brothers.   (Pls.' Resp. Ex. 11, DN 44-11 [hereinafter Clements Aff.]). Clements, however, only states that the access roads on the property currently vary in width from 10 to 30 feet, but he neither makes any comparison to prior uses nor expresses any opinion that the current roadways constitute an unreasonable use.[1]   (Clements Aff. ¶ 6).  Plaintiffs' claims are

---

[1] Defendant has moved to strike this from the record, arguing that the statement is directly contrary to Clements' prior deposition testimony which states that he measured the roads at under 12 feet in width.  (Clements Dep. 22:13-17, Feb. 23, 2016, DN 46-2; Def.'s Mot. Strike, DN 46).  Even viewing the facts most favorable to Plaintiffs that the roads have expanded in width, Clements fails to support Plaintiffs' claims that Defendant's access roads utilize more surface estate than is reasonably necessary.  *See TracFone Wireless, Inc. v. Zip Wireless Prods., Inc.*, 716 F. Supp. 2d 1275, 1290 (N.D. Ga. 2010) ("Motions to strike are generally viewed with disfavor and are 'often considered time wasters.'"   (citation omitted)).   Therefore, Plaintiffs' motion to strike is denied.

based on an unreasonable use of the surface by Defendant.  On this point, Defendant has produced affirmative opinion evidence that its use is reasonable, and Clements does not rebut this proof.

Plaintiffs' counsel's argues that the "ever-expanding" roadways and well sites take up more land that is reasonably necessary, but this assertion is not evidence.  *See Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009) ("[A]rgument of counsel is not evidence, and cannot provide a proper basis to deny summary judgment."  (citing *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1198 n.6 (10th Cir. 2008))).  In fact, the only proof that Plaintiffs cite to support their claims is a calculation of how much acreage the roadways and well-sites currently occupy.  (Clements Dep. 23:19-23).  There is no evidence that this acreage constitutes an unreasonable amount of the surface estate, or that the access roads are "ever expanding."

The Court reiterates that Defendant has a right, as the mineral owner, to use as much of the surface estate as reasonably necessary to conduct their drilling operations.  Plaintiffs present no evidence that the surface area used for access roads and wells is not reasonably necessary and have therefore failed to create a jury issue as to the substance of this claim.  Accordingly, Defendant's motion for partial summary judgment as to the claims regarding the access roads and well sites will be granted, not only as to the defenses of release, statute of limitations, and laches, as discussed above, but also for failure to produce evidence of substance to support Plaintiffs' claims.

### B.    <u>Electric Lines and Poles</u>

Plaintiffs' claims regarding the electric lines and poles can be divided into two claims: (1) the electric lines and poles utilize more of the surface area than is reasonably necessary and (2) the electric lines and poles are an unreasonable use of the land because of the danger that the

structures pose.  (Compl. ¶¶ 5, 6).  Plaintiffs seek damages for 7.82 acres that they claim is taken

out of production by the presence of the lines and damages in the amount of $459,900 to bury the

powerlines.  (Pls.' Ans. Interrog. 17).

For the same reasons as discussed above regarding the access roads and well sites,

Plaintiffs' claim that the electric lines and poles utilize more land than is reasonably necessary

for the oil operations are barred by the statute of limitations and the doctrine of laches.  The

powerlines were installed on the property by Ashland.  (Coker Aff. ¶ 6).  Ashland sold to Geigo

in 1991, thus the electric lines and poles were on the property no later than 1991 and have been

in that same location since.  (Coker Aff. ¶¶ 5, 6; T. Bickett Dep. 23:3-24:7, 42:22-43:8).

Plaintiffs have submitted no proof to dispute this fact and the record indicates that Plaintiffs were

aware of the lines on their property since the installation.  (T. Bickett Dep. 23:3-24:7, 42:22-

43:8).  This action was not filed until November 25, 2014.  Thus, any claims related to the

electric poles are barred by the five-year statute of limitations.  *See* KRS 413.120(6).

Moreover, Plaintiffs cannot claim that the electric poles and lines are a continuing

trespass because the electric lines are clearly permanent structures.  *See Fergerson*, 313 S.W.2d

at 400 (stating that a structure is permanent "if the structure is one which may not be readily

remedied, removed, or abated, at reasonable expense, or is of durable character intended to last

indefinitely . . . .").  The record establishes that the poles have been in place on the property for

not less than 25 years.  Additionally, the doctrine of laches bars Plaintiffs' claims.  Plaintiffs sat

on their rights since at least 1991 before bringing suit, prejudicing Defendant as to availability of

proof.  *See Joseph*, 2009 WL 1974596, at *3.  Therefore, the Court finds that Plaintiffs' claims

that the electric poles utilize more surface estate than reasonably necessary are barred by the

statute of limitations and the doctrine of laches.

Defendant is also entitled to summary judgment because Plaintiffs have provided no evidence that the area utilized by the electric lines and poles is unreasonable under the circumstances. (Roberts Report 3). Defendant has submitted an expert report describing the uses of the surface area by Defendant, including the location of the electric lines, as reasonably necessary for the production of oil. (Roberts Report 3). Roberts notes that "[w]here possible the electric lines and poles have been placed next to existing roads thereby minimizing the surface usage" and that "any increase in farmable area [by moving the poles] would be minimal." (Roberts Report 3). Plaintiffs do not submit any proof to dispute Roberts' opinion regarding the reasonable use as to the power lines. Thus, there is no genuine issue of material fact present and Plaintiffs' claim that the location of the electric lines and poles fails as a matter of law.[2] *See Chesapeake Appalachia, LLC*, 2012 WL 2178859, at *4 ("To survive summary judgment, however, Williams must cite evidence that Chesapeake's operations are unreasonable . . . .").

Plaintiffs also claim that the use of the electric lines is an unreasonable and ultrahazardous use of the surface area, seeking $459,900 in damages to bury the lines. Plaintiffs have provided no legal support for the claim that Defendant is responsible for the costs of burying the lines, and the Court is aware of none that exists. The Court likewise rejects Plaintiffs' claim that the powerlines constitute an ultrahazardous activity. It is clear under Kentucky law that powerlines and other forms of electrical transmission are not considered an ultrahazardous activity so as to invoke strict liability. *See Ky. Utils. Co. v. Auto Crane Co.*, 674 S.W.2d 15, 18 (Ky. App. 1983) ("Furthermore, Kentucky has never adopted a strict liability

---

[2] Similarly, Plaintiffs also complain that there are eight access points on the property and that this is an unreasonable amount; however, Plaintiffs have adduced no evidence to demonstrate how the number of access points utilizes more property than is reasonably necessary. (Compl. ¶ 8).

standard for the transmission of high-voltage electricity.  Most courts have uniformly rejected the doctrine that the transmission of electricity is an ultrahazardous activity."  (citation omitted)).

Under the governing deeds, Defendant is obligated to pay for *actual damages* it causes to the surface.  (1966 Surface Deed; 1965 Mineral Deed).  Thus, if the electric lines and poles are negligently maintained, as Plaintiffs allege, this does not shut off *potential* liability for *future* damages that actually occur. Presently, the only damages sought by Plaintiffs are to bury the lines because of the risk of future danger.  Absent actual damages to the property, there is no right for recovery of money damages.  Plaintiffs rely upon *Hughett v. Caldwell County*, 230 S.W.2d 92 (Ky. 1950), *abrogated on other grounds by Harrod Concrete & Stone Co. v. Crutcher*, 458 S.W.3d 290 (Ky. 2015), for the proposition that they are entitled to damages because "[c]ompensation is always the aim of the law." *Hughett*, 230 S.W.2d at 96.  In *Hughett*, Kentucky's highest court explained that the purpose of damages is "[t]o restore the party injured, as near as may be, to his former position is the purpose of allowing a money equivalent of his property which has been taken, injured, or destroyed." *Id*. (internal quotation marks omitted) (citation omitted)  Plaintiffs have not demonstrated that they have presently suffered any injury or expended any money to bury the lines.  Thus, the Court cannot see how awarding Plaintiffs the cost of burying the lines would "restore [Plaintiffs] . . . to their former position." *Id*.

Thus, the Court holds that the Plaintiffs' claims in regards to the electric lines and poles fail and summary judgment as to these claims is granted for Defendant.

### C.   Gates and Pipe Bridges

Plaintiffs complain that the access gates on the property are maintained by Defendant in an unsafe condition, allowing trespassers to move onto the property and dump trash.  (Compl. ¶ 8).  Plaintiffs claim damages to remove the existing gates and to install new ones on the property.

(Pls.' Initial Disclosures 4).   Plaintiffs also claim damages for the pipe bridges located on the property.   (Compl. ¶ 9).   Specifically, Plaintiffs argue that one pipe bridge should be replaced because the bridge is unsafe and unstable, exposing them to potential liability and the second pipe bridge on the property should be removed because there are other ways to access a certain well besides the pipe bridge.   (Pls.' Ans. Interrog. 6-7).   Defendant asserts that Plaintiffs have not stated a proper cause of action as to the pipe bridges or the gates because Plaintiffs do not own them nor have they stated any legally cognizable damages.   (Def.'s Mot. Partial Summ. J. 29-32).

Defendant relies on *Evans v. Williams*, 165 S.W.2d 52 (Ky. 1942), for the proposition that a proper cause of action requires a legal right in the object in which damages are sought.   *See id.* at 54-55 ("The essential elements of a good cause of action are the existence of a legal right in the plaintiff, with a corresponding legal duty in the defendant, and a violation or breach of that right or duty with consequential injury or damage to the plaintiff, for which he may maintain an action for the recovery of money damages or other appropriate relief."   (internal quotation marks omitted) (citation omitted)).   Defendant argues that because the gates and pipe bridges were installed by Ashland, the gates are not owned by Plaintiffs and they therefore have no right to bring a legal claim for damages to repair and replace the gates and bridges.   (Def.'s Mot. Partial Summ. J. 29-31).   Kentucky law allows for damages to recover costs for repair where injury to property is found to be temporary, i.e., "by finding that the property may be restored at an expense less than the total amount by which the injury decreased the property's value."   *Ellison v. R & B Contracting, Inc*., 32 S.W.3d 66, 70 (Ky. 2000).   Yet, the Court agrees with Defendant that in order to receive these damages, the plaintiff bringing the claim must *own* the property for

19

which they seek replacement costs.  Thus, Plaintiffs cannot attain the remedy that they seek, and have not brought a proper cause of action as to the gates and pipe bridges.

Although Plaintiffs cannot recover the replacement costs of these structures, they could *potentially* recover for any *future* damages caused by Defendant's negligence in the maintenance of these structures.  As with the powerlines, though, Plaintiffs have failed to presently demonstrate that they have suffered any actual damages.

Actions for damages to real property caused by another's negligence sound in trespass, not negligence.  *Wimmer*, 733 S.W.2d at 760.  Thus, Kentucky courts recognize negligent trespass as a cause of action.  *Rockwell Int'l Corp. v. Wilhite*, 143 S.W.3d 604, 620 (Ky. App. 2003).  The elements of negligent trespass are:  "(1) the defendant must have breached its duty of care (negligence); (2) the defendant caused a thing to enter the land of the plaintiff, and (3) the thing's presence causes harm to the land."  *Id.* (citing *Mercer v. Rockwell Int'l Corp.*, 24 F. Supp. 2d 735, 740-41 (W.D. Ky. 1998)).  A party seeking relief must show both a "negligent act or omission *and* legally cognizable damages."  *Alagia, Day, Trautwein & Smith v. Broadbent*, 882 S.W.2d 121, 126 (Ky. 1994) (emphasis added).  Consequently, "[w]ithout damages, there is no ripened claim."  *Meade Cty. Bank v. Wheatley*, 910 S.W.2d 233, 235 (Ky. 1995).

The harm Plaintiffs' claim to have suffered due to the alleged negligent maintenance of the gates is that the open gates allow trespassers to enter the property "permitting garbage, trash and no-telling what other kind of hazardous materials to be dumped on the farm property."  (Pls.' Resp. 28).  Plaintiffs' negligence claim in regard to the gates fails because Plaintiffs have not shown that it was Defendant's action or inaction that *caused* the trespassers to enter onto Plaintiffs' land or that Defendant has any duty to install or maintain the gates in the first place. As Defendant points out, the gates are not the only entrance by which a trespasser could access

the property as the property perimeter is not fenced.   (Def.'s Reply 14).   Plaintiffs have submitted no evidence demonstrating that trespassers actively use the Defendant's gates as an access point to the property.   *See Celotex Corp.*, 477 U.S. at 322 (holding that summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").   Plaintiffs are alleging that Defendant's structure is enabling third party trespassers to enter onto the property and interfere with Plaintiffs' surface use.   Absent proof how Defendant's action or inaction with respect to the gates has *caused* them any legally cognizable damages, Plaintiffs' claim fails.

Plaintiffs have likewise not shown how the pipe bridges have caused them to suffer damages.   The crux of Plaintiffs' claim is that the pipe bridge is an unsafe and hazardous condition that exposes them to potential future liability.   Plaintiffs do not cite to any case law in support of their contention that a potential exposure to future liability can constitute harm to support a negligence claim, and this Court has found none.   (Pls.' Ans. Interrog. 7).   Therefore, because Plaintiffs have not shown how they have suffered any *present* harm to their land because of the existence of the pipe bridges, Plaintiffs' claim fails.

Plaintiffs' claims as to the gates and pipe bridges fail as a matter of law because they have not demonstrated how these structures have caused them legally cognizable damages. Plaintiffs contend that their failure to show certainty in amount of damages does not defeat a claim at summary judgment.   (Pls.' Resp. 26-27).   Plaintiffs' argument misses the mark, however, as it is not the certainty of damages that Plaintiffs have failed to prove, but instead the fact of damage.   In *Gibson v. Kentucky Farm Bureau Mutual Insurance Co.*, 328 S.W.3d 195 (Ky. App. 2010), the Kentucky Court of Appeals discussed the difference between the

uncertainty as to the fact of damage and the uncertainty as to amount of such damages. *Id.* at 205. In so doing the Court recognized that no recovery is available where there is uncertainty as to the fact of damage. *Id.* (citing *Johnson v. Cormney*, 596 S.W.2d 23 (Ky. App. 1979), *overruled on other grounds by Marshall v. City of Paducah*, 618 S.W.2d 433 (Ky. App. 1981)). Thus, it is Plaintiffs' failure to prove that they have suffered some damages with respect to Defendant's maintenance of the gates and the pipe bridges that defeats their claims. Therefore, summary judgment as to the claims for the pipe bridges and the gates is granted for Defendant.

### D.  Maintenance of Access Roads and Well Sites

Plaintiffs contend that the maintenance of the access roads and well sites interfere with their use of the surface estate because grasses around the wellheads are not sprayed or mowed. (Compl. ¶ 7). Plaintiffs allege that these grasses come to seed and adversely affect the crop production surrounding the roads and well sites. (Compl. ¶ 7). Plaintiffs seek as damages labor costs to mow and spray the vegetation; however, these are not legally cognizable damages. (Pls.' Initial Disclosures 4). Plaintiffs have attempted to impute duties on Defendant that do not exist in law or per the deeds. Of crucial importance, Plaintiffs provide no explanation of how Defendant has prevented Plaintiffs from mowing and spraying these areas. If the weeds are growing on the surface it seems incumbent upon Plaintiffs, as owners of the surface rights, to mow or spray the weeds.

Plaintiffs speculate that the grasses around the well sites "come to seed" and disburse among the crops which negatively impacts the surrounding crops; however, Plaintiffs do not cite to proof in the record that the grasses in fact do interfere with crop production. *See* Fed. R. Civ. P. 56(c)(1) (stating that the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing

that the materials cited do not establish the absence . . . of a genuine dispute . . . ." ).  Plaintiffs have submitted photographs of this "noxious vegetation" on their property in comparison with Defendant's operations on other nearby farms.  These photographs are not evidence that the "noxious vegetation" interferes with Plaintiffs' farming operations.  *See Chesapeake Appalachia, LLC,* 2012 WL 2178859, at *4 (noting that photographs of other well sites around eastern Kentucky did not create a genuine issue of material fact because the photographs were not evidence of interference on *the plaintiff's* property.).  These photographs do not create a genuine issue of material fact that Defendant has interfered with and caused unreasonable damage to Plaintiffs' use of the property.  Moreover, Defendant has no duty per statute or the governing deeds to maintain these areas to Plaintiffs' satisfaction.

Therefore, the claims in regards to the "noxious vegetation" fail as a matter of law and summary judgment as to these claims is granted for Defendant.

### E.    Crop Damage Due to Seismic Testing

Plaintiffs have moved for summary judgment as to the claim regarding crop damage from seismic testing.  (Pls.' Mot. Partial Summ. J. 2-5).  Defendant responded and admitted liability for the crop damage due to the seismic testing.  (Def.'s Resp. 4). Defendant "has no objection to the entry of partial summary judgment which establishes that [Defendant] is responsible for the payment of crop damages to [Plaintiffs] relative to the seismic exploration."  (Def.'s Resp. 4). Therefore, summary judgment as to liability for the claim for crop damage which occurred because of seismic testing is granted for Plaintiffs.  The amount of damages still remains a disputed issue.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.   Plaintiffs' Motion for Partial Summary Judgment (DN 41) is **GRANTED**;

2.   Defendant's Motion for Partial Summary Judgment (DN 42) is **GRANTED**; and

3.   Defendant's Motion to Strike (DN 46) is **DENIED**.

**Greg N. Stivers, Judge**
**United States District Court**

March 30, 2017

cc:   counsel of record